**Henry I. FILLMAN, Ancillary Administrator of the Estate of Johann Heinrich Karl Wehrli, also known as Charles Wehrli**

v.

**The UNITED STATES.**

**No. 541-58.**

United States Court of Claims.

Jan. 21, 1966.

Henry I. Fillman, New York City, attorney of record, for plaintiff.

Edna G. Parker, Tax Div., Dept. of Justice, Washington, D. C., with whom was Acting Asst. Atty. Gen. Richard M. Roberts, for defendant. C. Moxley Featherston, Lyle M. Turner, and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

COWEN, Chief Judge.

Plaintiff is the Ancillary Administrator of the estate of Charles Wehrli, de-

ceased, who was a citizen and resident of Switzerland and who died on November 2, 1948. Plaintiff brought this action for the refund of Federal estate taxes and interest which were imposed pursuant to the provisions of Sections 811, 861, and 862 of the Internal Revenue Code of 1939, 26 U.S.C. §§ 811, 861, and 862 (1952 Ed.).[1] The question for decision is whether at the time of his death the decedent owned certain securities which were then in the physical possession of the Guaranty Trust Company of New York.

The facts are set forth in detail in our findings of fact and will be summarized only to the extent needed to explain the basis for the result we have reached. The decedent owned and operated a bank in Zurich, Switzerland, and from 1937 until his death, his son, Peter Wehrli, was associated with him in business and investments. Beginning in 1939 and continuing throughout the period involving the transactions in this case, Peter Wehrli was fully authorized to act for his father.

In 1939, two corporations were organized under the laws of Argentina. The first was named Stella S.A. Argentine Commercial Industrial y Financiera, hereinafter Stella, and the second was named San Juan Sociedad Anonima Commercial Financiera and Industrial, hereinafter San Juan. The Argentine corporations were formed with the assistance of decedent's nephew, who acted as nominee for decedent and his associates, Max Reutter and Karl Kessler. Funds and securities belonging to decedent and his associates were transferred to the two corporations because of fear that the German Army might invade Liechtenstein and Switzerland and seize any assets found there. Both corporations engaged in the purchase and sale of securities in South America, New York, and London.

San Juan and Stella opened securities custody accounts with the Guaranty

Trust Company of New York in 1939 and 1942, respectively. Both companies designated Peter Wehrli, decedent's son, solely, or Cordova Moyano and Robert J. J. Lagier, signing jointly, as the sole persons whose instructions on behalf of the two corporations should be recognized and complied with by Guaranty Trust Company. Their powers included the power to withdraw securities free of payment.

From time to time, securities held in the Guaranty Trust custody accounts in the names of San Juan and Stella were sold and other securities were purchased. At the time of decedent's death, the securities upon which the estate taxes were levied consisted of stocks in United States domestic corporations, Republic of Uruguay bonds, and six-percent debentures of Liebmann Breweries, Inc. The shares of stock and debentures were registered on the books of the various corporations in the name of the nominee of the Guaranty Trust Company, and this was also true of the Uruguay bonds.

In connection with the settlement of decedent's estate, an inventory was prepared for Swiss tax purposes. The Swiss tax authorities discussed with Peter Wehrli the assets to be included in the inventory and all of the securities in issue here were listed in the inventory. All of the securities, plus cash in the custody accounts of Stella and San Juan, were ultimately distributed either to the heirs of the decedent or were used in payment of administration expenses.

On May 1, 1950, plaintiff, as Ancillary Administrator, filed a nonresident alien estate tax return and paid $86,606.16, the tax shown to be due thereon, plus interest. On November 14, 1952, the Collector of Internal Revenue corrected the total value of the securities and assessed a deficiency estate tax of $6,030.65, and on December 5, 1952, the deficiency, plus interest thereon, was paid. Thereafter, plaintiff filed a timely claim for refund of the total amount of the estate tax so

1. In general, these sections of the 1939 Code provide that there is includible in the estate of an alien decedent and subject to the estate tax, all of his interest in any property that is situated in the United States at the time of his death.

paid and filed this suit after the claim was disallowed in its entirety.

◼ In Burnet v. Brooks, 288 U.S. 378, 53 S.Ct. 457, 77 L.Ed. 844 (1933), the Supreme Court construed Sections 302(a) and 303(b) of the Revenue Act of 1924 which, in pertinent part, are the same as Sections 811(a) and 861(a) of the Internal Revenue Code of 1939. As a result of that decision, there is no longer any question that bonds of foreign governments and of foreign and domestic corporations, as well as stocks of foreign corporations and domestic corporations, belonging to a nonresident alien but physically within the United States at the time of his death are includible in his estate for Federal estate tax purposes. It is undisputed that all the securities in issue here were situated in the United States at the time of decedent's death. Therefore, they were subject to the Federal estate tax if he owned them at the time of death.

Plaintiff's basic contention is that Stella and San Juan had all of the privileges of ownership in the securities in the custody accounts in the Guaranty Trust Company and, therefore, that decedent was not the owner and holder of the securities at the time of his death within the meaning of Section 862(a) of the Internal Revenue Code of 1939, 26 U.S.C. § 862(a) (1952 Ed.).[2]

◼ In support of his contention, plaintiff points to our findings 12(c) and 14(b), which state that after the securities had been acquired and subject only to restrictions resulting from the blocking of the custody accounts, pursuant to wartime regulations, San Juan and Stella had complete power to deal with the securities, including the power to sell them, to vote the stock, and to collect the dividends on the stock and the interest on the bonds. Guaranty Trust Company collected the interest and dividends for the account of San Juan and Stella. It is true that such findings, standing alone and isolated from the remainder of the record, lend support to plaintiff's theory of the case. However, the indicia of ownership in San Juan and Stella are shown to be entirely superficial when matched against the solid array of evidence as to the capacity in which each corporation acted. In our view, the following summarized facts demonstrate quite conclusively that every action which San Juan and Stella took with respect to the securities throughout the period pertinent to this action was performed in a capacity which each corporation accurately characterized as that of a mere depositor and custodian for the decedent, the real owner:

(a) On April 21, 1942, the Secretary of the Treasury issued General Ruling No. 12 (5 F.R. 1400), which, as a part of the wartime restrictions on blocked accounts, provided that no transactions involving securities in blocked accounts could be effected unless the person with whom the account was maintained was in possession of the name and address of each person having an interest in the securities on April 8, 1940, or on the date when the securities were received in the account. In 1945, Guaranty Trust Co. requested Stella to furnish the information called for by General Ruling 17 and, in response thereto, Peter Wehrli wrote the bank on Stella's letterhead, stating that all the securities in Stella's custody account at the bank since April 8, 1948, or the date when the securities were deposited, were the property of the decedent, a citizen of Switzerland.

(b) On June 7, 1948, Peter Wehrli wrote plaintiff's law firm, retaining the firm to take whatever steps that were necessary to obtain a release of the blocked accounts of San Juan and Stella in the Guaranty Trust Company. The letter

---

**2.** Section 862(a), which relates only to stock in domestic corporations and, therefore, is not applicable to many of the securities in issue, provides:

"For the purpose of this subchapter—

"(a) *Stock in domestic corporation.*— Stock in a domestic corporation owned and held by a nonresident not a citizen of the United States shall be deemed property within the United States; * * *."

stated that Peter Wehrli and his father were the "sole legal and beneficial owners" of the securities in the custody accounts and that "no other person, firm, corporation or association has any legal, beneficial, or equitable ownership" therein.

(c) On June 9, 1948, Peter Wehrli wrote the Guaranty Trust Company that the Uruguay bonds on deposit in San Juan's custody account were the property of Charles Wehrli. Under date of July 1, 1948, plaintiff informed the Office of Alien Property that the securities involved here were held by Stella and San Juan for Charles Wehrli and Peter Wehrli, who owned them. Thereafter, on January 26, 1949, plaintiff filed an application for authorization to Guaranty Trust to unblock the securities in the custody accounts of San Juan and Stella and therein stated that the securities were owned by the decedent. Upon the granting of the application, a license was issued, reciting that the securities were all beneficially owned by decedent.

(d) On November 13, 1948, 11 days after the death of his father, Peter Wehrli wrote Guaranty Trust and requested the bank to forward to Switzerland a schedule listing all the securities deposited in the custody accounts of San Juan and Stella. He directed the bank that it should state that the securities were the property of the decedent.

(e) All of the securities in issue were carried on the books of Stella and San Juan in accounts entitled "Depositors of Securities for Safekeeping, Administracion Confidencia I.", a code name for the decedent. Stella and San Juan so certified all the securities to the Swiss tax expert, who represented the decedent's estate, and all of such securities were listed in the inventory of decedent's assets as required by Swiss law in the settlement of his estate. That action was taken after the Swiss authorities had consulted with Peter Wehrli.

(f) Guaranty Trust prepared, as of November 17, 1948, a statement of securities held in which it was stated that Mr. Charles Wehrli, the deceased, was the owner of the securities held in the custody accounts of San Juan and Stella.

(g) On March 7, 1949, Peter Wehrli requested Guaranty Trust to transfer all the cash and securities held in the accounts of San Juan and Stella to a new account to be opened in the name of "Estate of Charles Wehrli." The transfers were made and, as we have stated above, the securities were ultimately distributed to the heirs of Charles Wehrli or used in payment of the expenses of administering his estate.

The Second Circuit held and this court thereafter agreed that the equitable or beneficial interest of a nonresident alien decedent in corporate stock is property, the value of which is to be included in decedent's gross estate for taxation. Commissioner v. Nevius, 2 Cir., 76 F.2d 109 (1935), cert. denied, 296 U.S. 591, 56 S.Ct. 104, 80 L.Ed. 419; City Bank Farmers Trust Co. v. United States, 149 F.Supp. 186, 137 Ct.Cl. 798 (1957). Also, the Treasury Regulations, beginning with those promulgated pursuant to the Revenue Act of 1924 and continuing to the present time, have provided in substance that there shall be included in the gross estate of the decedent the value of all property in which he has the beneficial ownership.[3] In this case, however, we need not delineate nor discuss the distinction between equitable and legal interests in property. In the words of dece-

3. See Article 10 of Treasury Regulations 68, promulgated under the Revenue Act of 1924, ch. 243, 43 Stat. 253; Article 10 of Treasury Regulations 70, promulgated under the Revenue Act of 1926, ch. 27, 44 Stat. 9; Article 10 of Treasury Regulations 80 (1934 ed.), promulgated under the Revenue Act of 1926 as amended and supplemented by the Revenue Acts of 1928, ch. 852, 45 Stat. 791, 1932, ch. 209, 47 Stat. 169, and 1934, ch. 277, 48 Stat. 680; Article 13 of Treasury Regulations 80 (1937 ed.); Section 81.13 of Treasury Regulations 105, promulgated under the 1939 Internal Revenue Code; Section 20.2033–1 of the Treasury Regulations on Estate Taxes, promulgated under the 1954 Internal Revenue Code.

dent's son, who was fully empowered to act for him, no other person, firm, corporation, or association had any legal, beneficial, or equitable ownership in the securities which are the subject of this suit.

The decisions of this court in James v. United States, 63 Ct.Cl. 379 (1927), Bickford-Smith et al. v. United States, 80 F.Supp. 660, 112 Ct.Cl. 144 (1948), and *City Bank Farmers Trust Co.*, supra, which are cited in plaintiff's brief, do not aid plaintiff's cause. The facts involved in those cases are in nowise comparable. In each, the decedent had neither possession nor the right to possession of the securities. All of the indicia of ownership were in another person and decedent had no right, present or future, to the return of the securities.

Since we have concluded that the decedent owned and held the securities in issue within the meaning of the applicable statutes, it follows that plaintiff's petition must be dismissed.